

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:25-cr-210 |
| v. | |
| IBRAHEEM SABRI SAMIRAH | |
| Defendant. | |

STATEMENT OF FACTS

The United States and the defendant IBRAHEEM SABRI SAMIRAH ("the defendant" or "SAMIRAH") agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence, all dates listed being on or about the date indicated:

*Background Information*

1. At all relevant times, SAMIRAH resided in Herndon, Virginia, which was located within the Eastern District of Virginia.

2. On September 30, 2019, Nova Healthy Smiles PLLC ("NHS") was formed in the Commonwealth of Virginia, with the principal office address in Herndon, Virginia—the address for SAMIRAH's residence at the time. In September 2020, NHS's address was updated to Samirah's new residential address in Herndon, Virginia.

3. Sonabank, later renamed Primis Bank, provided a range of traditional banking services throughout the United States, including in the Eastern District of Virginia, and was a financial institution as defined by Title 18, United States Code, Section 20. Sonabank was

headquartered in Glen Allen, Virginia.

4. In response to the economic crisis caused by the coronavirus pandemic, in March 2020, Congress made government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP"). The purpose of the PPP loans was to enable small businesses suffering from the economic downturn to continue to pay salary or wages to their employees. To qualify for a loan under the PPP, an applicant had to meet certain criteria, including, among other things, that it was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on an IRS Form 1099-MISC. Moreover, the amount of the loan that could be approved under the PPP was typically a function of the applicant's historic payroll costs. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, mortgage interest payments (but not mortgage prepayments or principal payments), rent payments, utility payments, interest payments on debt obligations that were incurred before February 15, 2020, or for refinancing certain specified SBA loans.

5. Small businesses applied for PPP loans with private lenders, including financial institutions such as Sonabank, that had been approved to participate in the program by the SBA. The lenders used their own funds to make the PPP loans, but the loans were guaranteed 100 percent by the SBA.

6. The PPP allowed the interest and principal on the PPP loans to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses. To receive PPP loan forgiveness, a qualifying business was required to submit a PPP loan forgiveness application, which was signed by an authorized representative of the business, to its PPP lender. In the PPP loan forgiveness application, the borrower (through its authorized representative) had to certify,

among other things, that it complied with all the requirements in the PPP rules, including the rules related to eligible uses of PPP loan proceeds, and that the information provided in the application was true and correct in all material respects. The lenders relied on the accuracy of the information contained in the PPP forgiveness applications and supporting documents.

7. The SBA received PPP forgiveness applications from PPP lenders through a cloud-based platform, known as Summit, through an Amazon Web Services GovCloud server located in Oregon. The SBA transmits the forgiveness payments from the SBA to the PPP lender through the FMS system to the Treasury. The primary server for FMS is in Sterling, VA.

*The Scheme and Artifice to Defraud and Its Manner and Means*

8. From at least in or around May 2020 through at least in or about August 2021, in the Eastern District of Virginia and elsewhere, the defendant did knowingly, in connection with the COVID-19 relief loan he applied for on behalf of NHS, devise and participate in a scheme and artifice to defraud Sonabank and the Small Business Administration ("SBA"), and to obtain money and property from them by means of materially false pretenses, representations, and promises concerning numbers of employees, quarterly and annual payroll expenses, annual revenues, and fictitious IRS tax and payroll documents submitted in support of said loan application, all in violation of Title 18, United States Code, Sections 1343.

9. By at least May 2020, SAMIRAH learned about the PPP loan program. On or about May 12, 2020, SAMIRAH applied for and was approved for a PPP loan of approximately $83,300 from Sonabank for NHS.

10. In support of the loan, SAMIRAH submitted a signed "Borrower Application Form" (SBA Form 2483). On the form, he listed himself as the primary contact for the loan. SAMIRAH falsely represented that NHS had four employees and an average monthly payroll of

3

$33,333.32. SAMIRAH further represented that the purpose of the loan was for payroll, lease/mortgage interest, and utilities.

11. On the Borrower Application Form, SAMIRAH agreed to several certifications by initialing next to them. These certifications were not true.

12. SAMIRAH falsely certified that NHS "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." He further falsely certified that "[t]he funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." Finally, SAMIRAH certified "that the information provided in th[e] application and the information provided in all supporting documents and forms is true and accurate in all material respects."

13. SAMIRAH submitted several supporting documents with the PPP loan application, including W-4 forms (Employee's Withholding Certificate), Payroll Journals, and Paychex payroll reports for January and February 2020. These documents listed four purported employees of NHS: SAMIRAH, Employee 1, Employee 2, and Employee 3. The Payroll Journals and Paychex payroll reports stated that NHS paid each of the purported employees $8,333.33 per month in January and February 2020 (of which they each received a net monthly paycheck for $7,695.83), resulting in total salary payments of $33,333.32 for each month. Likewise, SAMIRAH submitted a Internal Revenue Service (IRS) Form 941 (Employer's Quarterly Federal Tax Return) for NHS for 2020, which was signed by SAMIRAH and dated May 11, 2020. The IRS Form 941 covered the first quarter of 2020—January to March 2020—and listed four employees and $66,666.64 paid in wages, tips, and other compensation. SAMIRAH did pay payroll taxes associated with these wages, tips, and other compensation.

14.     SAMIRAH falsely represented that NHS paid four employees' payroll in January 2020 and February 2020, when in truth and fact, NHS did not run payroll journals for those periods until May 2020. None of the four purported employees received funds from NHS prior to May 2020. NHS issued paychecks for "Salary for January" purportedly dated "1/31/2020" and "Salary for February" purportedly dated "2/29/2020," but NHS did not have its financial account established until May 7, 2020.

15.     After May 14, 2020, checks were written from the NHS business account to various individuals, as noted in the table below:

| Check # | Paid To | Purported Issued Date | Memo | Posted Date | Amount |
|---|---|---|---|---|---|
| 98 | Employee 1 | 2/29/2020 | February Salary | 5/26/2020 | $7,695.83 |
| 100 | Employee 1 | 1/31/2020 | January Salary | 5/26/2020 | $7,695.83 |
| 1003 | Employee 3 | 1/31/2020 | Salary for January | 6/25/2020 | $7,695.83 |
| 1004 | Employee 3 | 2/29/2020 | Salary for February | 7/2/2020 | $7,695.83 |
| 1008 | Employee 2 | 6/16/2020 | 5/15-6/15 Salary | 6/26/2020 | $7,695.83 |
| 1009 | Ibraheem Samirah | 6/16/2020 | 5/15-6/15 Salary | 6/25/2020 | $7,695.83 |
| 1010 | Employee 1 | 10/28/2020 | (Blank) | 12/10/2020 | $6,540.60 |
| 1012 | Individual-1 | 6/16/2020 | 5/15-6/15 Pay/Salary | 7/10/2020 | $6,259.68 |
| 1013 | Employee 1 | 6/16/2020 | 5/15-6/15 Salary | 7/9/2020 | $6,259.68 |
| 1014 | Employee 3 | 6/16/2020 | 5/15-6/15 Salary/Pay | 12/18/2020 | $6,259.68 |
| 1016 | Individual-2 | 10/28/2020 | (Blank) | 12/11/2020 | $6,460.96 |
| 1017 | Employee 3 | 10/28/2020 | (Blank) | 12/22/2020 | $6,001.06 |
| 1018 | Ibraheem Samirah | 10/28/2020 | (Blank) | 12/7/2020 | $6,001.06 |
| 1019 | Individual-1 | 10/28/2020 | (Blank) | 12/22/2020 | $5,549.37 |
| 1023 | Ibraheem Samirah | 1/31/2020 | January Salary | 6/11/2020 | $7,695.83 |
| 1024 | Employee 2 | 1/31/2020 | January Salary | 6/8/2020 | $7,695.83 |
| 1025 | Employee 2 | 2/29/2020 | February Salary | 6/8/2020 | $7,695.83 |
| 1026 | Ibraheem Samirah | 2/29/2020 | February Salary | 6/11/2020 | $7,695.83 |

16. Besides the checks noted in the table above, the only other debits from the NHS business account at TD Bank were payments to the Paychex payroll service, an ATM withdrawal for a total of $455, and tax payments to the Internal Revenue Service.

17. Although the above checks appeared to be payments of salary, Employee 1, Employee 2, and Employee 3 sent money back to SAMIRAH. For example, on May 23, 2020, an account was opened at PNC Bank in the name of Employee 1. On May 26, 2020, two checks for $7,695.83 each, drawn from the NHS business account at TD Bank, were deposited in Employee 1's checking account at PNC Bank. One of these checks (check # 0100 drawn from the NHS business account at TD Bank) was dated January 31, 2020, and bore the note "January Salary." The second check (check #0098 drawn from the NHS business account at TD Bank) was dated February 29, 2020, and bore the note "February Salary." These two checks posted to the account on May 26, 2020, and comprised the total sum of $15,391.66 in Employee 1's PNC Bank account.

18. Also on May 23, 2020, an account was opened at JP Morgan Chase Bank (JPMC) in the name of Employee 2. On June 8, 2020, two checks for $7,695.83 each were deposited to the account via an ATM in Falls Church, Virginia, which comprised the total amount of $15,391.66 in Employee 2's JPMC account. One of those checks (check # 1024 drawn from the NHS business account at TD Bank) was dated January 31, 2020, and bore the note "January Salary." The second check (check # 1025 drawn from the NHS business account at TD Bank) was dated February 29, 2020, and bore the note "February Salary."

19. Between June 3, 2020, and June 11, 2020, there were 16 ATM withdrawals from Employee 1's PNC Bank account for a total amount withdrawn of $11,000 in cash. These ATM withdrawals all occurred at ATMs in Virginia and Washington, D.C. A review of Employee 1's

6

personal bank account at Bank of America shows consistent charges in northeastern Illinois throughout those same time periods. Between June 10, 2020, and June 11, 2020, there were four ATM withdrawals from Employee 2's JPMC account for a total amount withdrawn of approximately $4,300 in cash. The total amount of cash withdrawn from Employee 1's account and Employee 2's account for this time period was $15,300. On June 10, 2020, a cash deposit was made to SAMIRAH's personal TD Bank account in a counter transaction for $9,800; on June 11, 2020, a cash deposit was made to SAMIRAH's personal Bank of America account in an ATM transaction for $5,540. The total of these cash deposits to accounts controlled by SAMIRAH was $15,340.

20.     Furthermore, between June 15, 2020, and June 16, 2020, there were six ATM withdrawals from Employee 1's PNC Bank account for a total amount withdrawn of $4,340. On June 16, 2020, a cash deposit was made to SAMIRAH's personal Bank of America account in a counter transaction for exactly $4,340.

21.     On December 10, 2020, check number 1010 was paid from the NHS business account to Employee 1's Bank of America account for $6,540.60. On December 16, 2020, $5,000.00 in cash was withdrawn from Employee 1's Bank of America account in a teller transaction. The next day, on December 17, $1,500.00 was withdrawn from Employee 1's Bank of American account via an ATM identified as "CICERO WEST CHICAGO IL." Two days later, on December 19, a deposit of $6,520.00 was made into Ibraheem SAMIRAH's personal Bank of America checking account via an ATM identified as "CICERO WEST CHICAGO IL." Employee 1 lived in the Chicago metropolitan area in January and February 2020.

22.     On December 18, 2020, a check for $6,259.68 payable to Employee 3 was drawn from the NHS business account at TD Bank; $4,259.68 was deposited to the Bank of America

personal checking account of Employee 3, and $2,000.00 was received in cash. This check, #1014 from the NHS business account, bore the note "5/15 – 6/15 salary/pay." On December 22, 2020, a check for $6,001.06 payable to Employee 3 was drawn from the NHS business account at TD Bank; $4,001.06 was deposited to the Bank of America personal checking account of Employee 3 and $2,000.00 was received in cash. This check was #1017 from the NHS business account. From December 22 to December 29, 2020, $4,260.00 was withdrawn in cash from Employee 3's account via ATM. With the two instances of $2,000.00 cash received upon deposit of checks #1014 and 1017, the cash withdrawn from Employee 3's account totals $8,260.00. On December 22, 2020, a cash deposit of $1,100 was made via ATM to the NHS business account. On January 4, 2021, cash deposits of $7,160.00 were made to SAMIRAH's personal checking account at TD Bank via five separate ATM transactions at the same location. The total of these cash deposits to accounts controlled by SAMIRAH was $8,260, the same amount withdrawn from Employee 3's account.

23. On or about August 16, 2021, SAMIRAH electronically signed and transmitted the PPP forgiveness application to Sonabank. Sonabank submitted the PPP forgiveness application to travel to the SBA's cloud-based platform, Summit, via a cloud server located in Oregon.

24. SAMIRAH had access to the books and records of NHS. He applied for a PPP loan for NHS and knew that the numbers of employees, the identities of the employees, the payroll figures, the revenue figures, and the supporting documents that were provided to the lender and the U.S. Government in support of the application for a PPP loan were false and that the forgiveness application for the PPP loan was false.

25. In total, SAMIRAH's fraud scheme generated a loss of approximately $83,000.

26. This Statement of Facts includes those facts necessary to support the plea

agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case. Furthermore, this statement of facts is an admission of the defendant that can be used in subsequent court proceedings against him. This statement of facts does not constitute and are not part of compromise negotiations under Fed. R. Evid. 410 or any other provision of federal law. As such, the defendant agrees that this statement of facts should not be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law.

27. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date: June 27, 2025            By: _____
                                   Kathleen E. Robeson
                                   Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, IBRAHEEM SABRI SAMIRAH, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
IBRAHEEM SABRI SAMIRAH

I am Lloyd Liu, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Lloyd Liu, Esq.
Attorney for IBRAHEEM SABRI SAMIRAH